## In re Real Estate Tax Exemptions Appeal of Cornwall Manor of the United Methodist Church

*Wiley P. Parker,* for petitioner.
*Rosamond A. Presby,* for respondent.

EBY, *J.,* November 8, 1988 — Cornwall Manor of the United Methodist Church is a corportation which operates a residential community for retired persons in the Borough of Cornwall, Pennsylvania. In December 1987 the Lebanon County Tax Assessment Office notified Cornwall Manor that a portion of that premises was to be placed upon the tax assessment rolls of Lebanon County. A timely appeal was presented to the Lebanon County Board of Assessment. After a hearing before that board, the appeal for real estate tax exemption was denied.

In appropriate fashion, an appeal was presented to this court from the determination of the board of assessment. A hearing was conducted on June 21 and 22, 1988, following which the court directed the transcription of the record, and accorded both parties an opportunity to present a written memorandum in support of their respective positions. We have enjoyed the benefit of each party's memorandum and on the basis thereof, in addition to our review of the record and transcript, we enter this adjudication.

## FACTS

(1) Cornwall Manor is a non-profit corporation exempt from federal income taxation under section 501(C)(3) of the Internal Revenue Code.

(2) Cornwall Manor was founded in 1949 by members of the Philadelphia conference of the United Methodist Church in order to provide a

retirement home for retired clergy of the Philadelphia conference, their spouses and families, and others.

(3) The stated object of the corporation is to "provide a safe, comfortable residence for retired persons. . ." (Article II of bylaws).

(4) Cornwall Manor provides several different types of living arrangements including apartments, houses, independent living or studios and suites, a personal care program (minimal support of nursing care), and nursing home care (a combination of intermediate licensed care and skilled licensed nursing care).

(5) Cornwall Manor maintains an open admission policy — open to anyone of any faith, race, or color. This policy has been in effect since the founding of Cornwall Manor.

(6) To be considered for admission, an individual must complete an application for residence. The applicant must provide a listing of assets and liabilities, sources of annual income, personal medical history, and information about the applicant's health insurance coverage.

(7) Prior to 1979, individuals admitted to Cornwall Manor turned over substantially all of their assets to Cornwall Manor in exchange for residency and care for the balance of their lives. Approximately 80 individuals are living in independent living under this arrangement.

(8) Since 1979, residents are assessed for the services that are provided.

(9) An entrance fee is assessed based upon the accommodations in which the applicant will reside.

(10) Entrance fees for the cottages range from around $30,000 to as high as $168,000. Fees for new houses are related to the cost of constructing these houses.

(11) Entrance fees for apartment residents range from $18,900 to $87,500.

(12) In 1987, of approximately 30 people who applied for and were accepted into Cornwall Manor, the entrance fee was waived for two individuals.

(13) When a cottage is re-occupied by a subsequent resident, the entrance fee is put into the general operating fund.

(14) If an individual desires to move out from one of the new units, 50 percent of the entrance fee is amortized over a three-year period. The first $5000 of the amortized portion is non-refundable. If the agreement is terminated within one year of admission, 60 percent of the remaining amortized portion is refunded; if terminated within the second year of admission, 30 percent of the remaining amortized portion will be refunded; if terminated within the third year of admission, 10 percent of the remaining amortized portion will be refunded. If the agreement is terminated after three years of admission, the resident receives no refund of the amortized portion.

(15) Fifty percent of the entrance fee is not subject to amortization and will be refunded to the resident.

(16) For older units at Cornwall Manor, a different refund policy applies. An initial minimum of $5,000 is deducted from the entrance fee. If terminated within one year of admission, 60 percent of the remaining amount is refunded; if terminated by the resident within the second year of the resident's admission, 30 percent of the remaining amount is refunded; if terminated within the third year of admission, 10 percent of the remaining amount is refunded. If the agreement is terminated after three years of admission, there is no refund of any portion of the entrance fee.

(17) In addition to the entrance fee, a monthly charge is assessed for occupying a cottage or apartment. These monthly charges are assessed to pay for the cost of running Cornwall Manor.

(18) The monthly assessment covers maintenance of the property, transportation within a 15-mile radius, counseling and various activities, and utilities for apartments. Residents of the cottages separately pay for heating expenses.

(19) Meals are made available to residents of apartments and cottages. An additional charge is assessed should a resident choose to avail himself or herself of this option.

(20) If a resident requires skilled or intermediate nursing care, Cornwall Manor will make the facilities of the health center available. Residents of Cornwall Manor have priority for health center admissions and are charged at the prevailing rate. The resident is also required to continue paying the monthly maintenance fee for his/her residence.

(21) No one has ever been discharged because of an inability to pay monthly charges.

(22) Cornwall Manor has an endowment of slightly over $2,000,000. The corpus of this endowment cannot be invaded; the income of this endowment is used for benevolent care.

(23) Cornwall Manor also has an active fund-raising program under which support is received from the United Methodist Church.

(24) A resident may ask for financial support if the amount of their costs exceeds two-thirds of their income.

(25) Forty-four apartment residents received a subsidy in excess of 15 percent of their regular monthly charges.

(26) In 1987, other than the two residents admit-

ted without paying an admission fee, no residents were admitted under a reduced entrance fee.

(27) For 1987 the portion of total charges allocated as benevolent allowances for each of the living arrangements at Cornwall Manor was as follows:

Studio/Suites Benevolent allowances   14 percent
Apartments Benevolent allowances      16 percent
Houses Benevolent allowances          13 percent

(28) A resident who receives financial assistance must apply for and use all government support to which he or she may be entitled.

(29) A resident who receives financial assistance must execute documents giving Cornwall Manor a lien on all real and personal property then owned or acquired afterward to secure payment of the total amount of all subsidies received plus interest.

(30) A resident who receives financial assistance may not transfer any real or personal property without written permission from Cornwall Manor.

(31) Under the terms of the residency agreements, any subsidies which are not repaid during a resident's lifetime become a debt of the resident's estate.

## DISCUSSION

Cornwall Manor contends that that the 40 cottages and four apartment buildings recently placed on the tax rolls should be exempt from taxation pursuant to 72 P.S. §5453.202(a)(3). That statutory provision provides:

"(a) The following property shall be exempt from all county, borough, town, township, road, poor, county institution district and school (except in cities) tax, to wit:

"(3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learn-

ing, benevolence or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity: Provided, that the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose: Provided further, that the property of associations and institutions of benevolence or charity be necessary to and actually used for the principal purposes of the institution and shall not be used in such a manner as to compete with commercial enterprise."

This statute was promulgated pursuant to the Pennsylvania Constitution which provides: "The General Assembly may by law exempt from taxation . . . institutions of purely public charity." Pa. Constitution, Article VIII, section 2(a)(V).

The burden of bringing an organization within the statute lies with the organization claiming the exemption. Statutes which exempt real estate from taxation are to be strictly construed against the claimed exemption. *Pittsburgh Institute of Aeronautics Tax Exemption Case,* 435 Pa. 618, 258 A.2d 850 (1969). "When the tax burden is lifted from the shoulders of one, it must be redistributed among those who remain non-exempt." *Wyoming Valley Montessori Association Inc. v. Board of Assessment Appeals of Luzerne County,* 110 Pa. Commw 458, 532 A.2d 931 (1987).

In order for Cornwall Manor to be granted the claimed exemption from taxation, it must affirmatively show that the institution (1) is one of "purely public charity"; (2) was founded by public or private

charity; and (3) is maintained by public or private charity. *Appeal of Woods School,* 406 Pa. 579, 178 A.2d 600 (1962).

Whether Cornwall Manor is entitled to the tax exemption is a mixed question of fact and law on which the trial court's decision is binding absent abuse of discretion or lack of supporting evidence. Although prior cases have limited value as precedent because of the changing nature of the concept of charity and the unique circumstances of each case, review of other cases is helpful in identifying some of the criteria which are necessary in determining the issue. *G.D.L. Plaza Corporation v. Council Rock School District,* 515 Pa. 54, 526 A.2d 1173 (1987).

The Pennsylvania Supreme Court has recently synthesized the characteristics we must look to in order to determine whether an organization qualifies as a purely public charity. The entity must:

"(a) Advance a charitable purpose;

"(b) Donate or render gratuitously a substantial portion of its services;

"(c) Benefit a substantial and indefinite class of persons who are legitimate subjects of charity;

"(d) Relieve the government of some of its burden; and

"(e) Operate entirely free from private profit motive." *Hospital Utilization Project v. Commonwealth of Pennsylvania,* 507 Pa. 1, 487 A.2d 1306 (1985).

The fact that an organization is a non-profit corporation does not require that it should be exempt from taxation. *Hospital Utilization Project* at 21, 487 A.2d at 1316; *Pittsburgh Institute of Aeronautics Tax Exemption Case, supra,* 435 Pa. at 623, 258 A.2d at 853. It is also irrelevant that Cornwall Manor is exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code. The Pennsylvania Supreme Court has stated:

"This fact is immaterial and not controlling since we are not bound by federal determinations as to the charitable character of a school. More important, however, standards applied under the federal statute are totally different from those under the Pennsylvania statute — the federal statute applies to any educational institution, charitable or otherwise." *Hospital Utilization Project* at 21, 487 A.2d at 1317, citing *Pittsburgh Institute of Aeronautics Tax Exemption Case* at 627, 258 A.2d at 854.

Being guided by those legal principles, we view our focus as appropriately directed to a determination of whether Cornwall Manor qualifies as a purely public charity under the guidelines enunciated in *Hospital Utilization Project, supra.* While we will not debate that this retirement community advances a charitable purpose and operates free from a private profit motive, from the testimony and evidence presented we are unable to conclude that Cornwall Manor satisfies the remaining portion of the standard for determination as a "purely public charity."

The law requires that, in order to be granted an exemption, an entity "donate or render gratuitously a substantial portion of its services, . . . ." Prior to acceptance into any of the varying living arrangements available at Cornwall Manor, a prospective resident must execute a "resident agreement." While there is little question that Cornwall Manor subsidizes a portion of the fees and charges assessed to its residents, our review of the resident agreements precludes us from a finding that those services are donated or rendered gratuitously. Those agreements provide in part as follows:

"(a) Should a resident be unable to fulfill his or her financial obligations under this contract, the resident agrees to execute, acknowledge and deliver

upon the request of Cornwall Manor, any and all other documents necessary to enable Cornwall Manor to subsidize in whole or in part the costs of resident's residency and to perfect and to keep perfected, a lien on all of the resident's real and personal property then owned and thereafter acquired to secure payment to Cornwall Manor of an amount equal to the subsidies provided under this paragraph including interest at the legal rate plus the costs of perfecting and collecting on said lien.

"(b) A resident whose costs of residency are subsidized in whole or in part shall not transfer any property, real or personal, without prior written authorization of Cornwall Manor. Furthermore, should Cornwall Manor be unable to secure repayment of the subsidies made under this paragraph during the resident's lifetime, then the amount of such subsidies shall constitute a valid debt of resident's estate."

In exchange for admission into Cornwall Manor, a resident grants a security interest in all of his/her real and personal property in favor of Cornwall Manor.[1] During this proceeding, the allowances granted to some residences by Cornwall Manor have been referred to as subsidies or benevolences. Under either concept, it is fairly understood that there is no expectation of repayment for the help provided. Under the agreement language quoted above, however, Cornwall Manor has every right to expect repayment including interest at the legal rate and any cost advanced to perfect or collect on the lien created.

---

1. Testimony elicited at the hearing from the president of Cornwall Manor indicated that there was no possibility that Cornwall Manor may put a lien upon property of a resident. In light of the express language in the resident agreements, that testimony was apparently inaccurate.

Next, we must consider whether the allowances granted represent a "substantial portion" of the services provided by Cornwall Manor. We are mindful that a purely public charity does not cease to be such simply because it receives some payment for its services. *Appeal of Woods School* at 587, 178 A.2d at 604. Reviewing the information provided by Cornwall Manor, however, we cannot conclude that the requisite "substantial portion" of its services are gratuitously provided.

Cornwall Manor derives income from the residents in two fashions. The residents are charged an entrance fee at the time of their admission and are then charged a monthly assessment for services provided. For 1987, the most recent figures available at the time of the hearing, there were approximately 30 applications for residency. At that time, the entrance fee for the apartments and houses now under consideration ranged from $21,000 to $168,000. Of the 30 applicants in 1987, the entrance fee was waived for two potential residents or approximately seven percent of those who applied.

A representative sample of the proportionate share of the total monthly charges which are credited as allowances for each of the various types of living arrangements at Cornwall Manor is shown on exhibit 9. That exhibit reflects that the allowances compose the following percentages of the total monthly assessments: studios/suites — 14 percent; apartments — 16 percent; houses — 13 percent. The average allowance for the suites, apartments, and houses combined is 15.3 percent of the total monthly charges.[2]

_____

2. The accumulation of monthly charges for suites, apartments, and houses as shown on exhibit 9 is $140,092.54. The total allowances shown on the same exhibit is $21,502.09.

In short, the evidence presented by Cornwall Manor demonstrates that seven percent of the money derived from entrance fees and 15 percent of the potential collections for monthly assessments are charged as benevolences. While we must applaud the charitable intent of the administrators of Cornwall Manor and certainly do not demean the assistance which these allowances provide to the residents, we cannot conclude that the level of benevolence shown by Cornwall Manor's evidence demonstrates a donation or gratuitous rendering of "a substantial portion of its services."

The next factor which must be demonstrated for an entity to qualify as a purely public charity is that the actions of the entity benefit a substantial and indefinite class of persons "who are legitimate subjects of charity." Again, our review of the record in the case at bar shows that the purpose of Cornwall Manor, although laudable, cannot be considered as providing housing to people with limited incomes. To be considered for admission, the policy of Cornwall Manor is that residents must meet certain financial criteria. In addition to paying a substantial entrance fee, each resident must pay a monthly fee for the services provided.

The entrance fees vary according to the accommodations sought by the applicant. The range of those entrance fees for the units which are the subject of this appeal are as follows:

| | | | |
|---|---|---|---|
| Westwood | $35,700 | to | $ 63,000 |
| Gateway | $35,700 | to | $ 68,300 |
| North Hills | $21,000 | to | $ 53,000 |
| Laurel Place | $62,000 | to | $ 87,500 |
| Houses | $39,000 | to | $168,000 |

The monthly area charge for one person for the subject units ranges as follows:

| Westwood | $706 to $1,017 ($155 per month per extra person) |
| Gateway | $706 to $1,017 ($155 per month per extra person) |
| North Hills | $589 to $1,017 ($155 per month per extra person) |
| Laurel Place | $792 to $1,017 ($155 per month per extra person) |
| Houses | $674 per house ($59 per month per extra person) |

A review of the schedule of entrance fees and monthly charges as shown, leads us to conclude that the housing available at Cornwall Manor may well be beyond the means of an elderly person with "limited income." As a result, try as we might, we cannot conclude that the benefit accorded by residents at Cornwall Manor is directed to those individuals "who are legitimate subjects of charity."

Lastly for our attention is the requirement that Cornwall Manor demonstrate that its efforts relieve the government of some of its burden. The difficulty in arriving at that conclusion is amply demonstrated by the discussion above. While a portion of the services offered by Cornwall Manor are provided on a benevolent basis, the majority of residents enjoy the high quality of the facilities and wide range of services on a fee-paying basis. Under the law, Cornwall Manor cannot be determined to be relieving the government of some of its "burden" of caring for the elderly. *Appeal of the Lutheran Home at Topton,* 100 Pa. Commw. 244, 515 A.2d 59 (1986).

For the reasons set forth, we conclude that the record in the instant case is insufficient to establish that Cornwall Manor donates or renders gratuitously a substantial portion of its services, benefits a substantial and indefinite class of persons who are

legitimate subjects of charity or relieves the government of some of its burden. Cornwall Manor is therefore not entitled to exemption from local taxation for those portions of the retirement community under consideration.

## CONCLUSIONS OF LAW

(1) Cornwall Manor has not met its burden of showing that it is advancing a charitable purpose.

(2) Cornwall Manor does not donate or render gratuitously a substantial portion of its services to residents of its apartments and cottages.

(3) Cornwall Manor is not benefiting a substantial and indefinite class of persons who are legitimate subjects of charity.

(4) Cornwall Manor is not relieving the government of a portion of its burden.

(5) Cornwall Manor does not qualify as a purely public charity.

(6) Cornwall Manor has failed to show that the 40 cottages and four apartment buildings should be exempt from taxation.

(7) The decision of the Lebanon County Board of Assessments must be affirmed.